Good morning, Your Honors, and may it please the Court, Erin Murphy, on behalf of Appellant LSP Transmission. Minnesota's right of first refusal law grants an absolute preference to incumbents that already own transmission lines in Minnesota to construct federally approved transmission lines that are part of an interstate grid and are paid for by customers across multiple states. Counsel, let me ask you a question. If they did it like some states did it, and they were all one, generation, transmission, and distribution, the Tracy case would apply here, period, right? I think the Tracy, the much stronger argument that the Tracy case applies here. Wouldn't it just apply the way they talk about utilities and Justice Souter, the Court, goes on and on about utilities? No, here's why I think that there'd still be a question even in that situation, because what Tracy actually goes on and on and on about is state regulation of retail distribution of electricity. It's all together. If it were all together, that's why I do think it would be a much harder case if we were dealing with a state that actually still had a completely vertically integrated closed system, because in that system you would have a monopoly justification that was based in the historical way that states operated, but I think it's a critical distinction that that's not the kind of regulatory regime we're dealing with. And they'd still be part of these ISOs, right? In that kind of system, no. I mean, maybe we're talking about two different kinds of systems. If you have a system, we have vertical integration, but you're getting all of your Then, you know, I think the states don't have free reign to do whatever they want, because the Federal Power Act gives FERC control over the interstate transmission of electricity. And that's a critical, critical distinction, because the… But at the time of Tracy, that was true too, right? Sure, and Tracy wasn't a case that dealt with transmission. It was a case that only dealt with a preference in the retail markets for distribution of electricity at retail. And the court really, I mean, I urge you to look at it with this in mind, because I think you will find that on virtually every page of the opinion, the court is talking not about just general deference to states when it comes to regulating utilities, but about the particular type of power that states have when it comes to the retail markets. And the court particularly… And by retail markets, do you mean distribution? I mean distribution at the retail level. And here, what we have is a preference that has Well, what do you mean nothing to do? It hooks to a line that distributes. Actually, no. I mean, I think it's critical to… One of the critical things to understand here is this… It can't be nothing to do. It's how it gets there. Well, actually, I mean, so let me try and convince you that it's a little bit different from that. This right of first refusal applies to any incumbent in Minnesota, even if they have no retail distribution at all. So, I mean, you know, you've got intervener ITC Midwest here, which is a transmission-only company. It doesn't serve retail customers at all. But one end of its line hooks to the distribution, right? I'm sorry? One end of its line has to hook to distribution to make it distribution, right? Well, I… Transmission's in the middle. It owns the facility. You know, it's not doing the ultimate distribution to retail customers. They got hooked to them, though. You said nothing to do. I'm on your extreme word, nothing to do. I actually think it's, though, correct, because, I mean, if you're granting a right of first refusal without regard to whether the entity that gets the right of first refusal serves retail customers, then I don't see how you can say what you're doing is granting rights of first refusal to protect the ability to serve retail customers. I wasn't arguing that. Nothing to do just shocked me, because it's how the electricity gets there. I think… It's the interstate from here to there. Well, I think that the Federal Power Act draws a line between the ultimate… the transmission at kind of the final step and the transmission at the interstate level. And here, I do want to be clear that, you know, this… like, what FERC has done here is itself, it's drawn that line. And the rights of first refusal that FERC eliminated are particularly as to the interstate lines, and even more than that, they're as to the particular interstate lines that are subject to these regional cost allocation principles. So, what FERC eliminated a right of first refusal to is only as to lines where people in Iowa have to help pay for half the cost of the line being built in Minnesota. And I think that that, you know, is… demonstrates why this right of first refusal is particularly pernicious in ways that other ones, like beyond what your ordinary one is. In what ways is it pernicious? It's pernicious in… first of all, because what it does is it precludes competition in the market for constructing these interstate transmission lines. I mean, that's the goal of a right of first refusal to say, we're not going to let anybody compete the right to purchase… to construct these. We're going to automatically assign it to Minnesota companies. So, right there, you're depriving the market of competition. But I think what makes it particularly pernicious is the fact that, as the Iowa Consumer Advocate explains in its amicus brief supporting us here, you're talking about lines that are part of an interstate grid and are paid for by rate payers in other states. So, when Minnesota says, we'd rather keep the business in Minnesota, even if that means excluding competition and having higher FERC rates because there's no competition, what they're doing is driving up the rate that Minnesota… and rate payers in all of the 15 MISO states are going to have to pay for these interstate transmission lines. So, I think that that demonstrates that, you know, you not only have the essential ordinary vice of a protectionist measure in that you're precluding out-of-state entities from offering their services in-state, which is impermissible under a long line of cases, but you also have the other essential vice that this Court and the Supreme Court have consistently recognized in the energy context of doing this at the expense of customers in other states. And I'd point you in particular to this Court's decision in the Middle South Energy case. That's a case where the Arkansas PSC had tried to prevent its local utilities, it tried to void power purchase agreements that they'd entered into with a generator that the state PSC thought was going to have too high cost of energy. And the reason the state PSC had done that is it said, look, we're trying to protect Arkansas rate payers. We don't want them to have to pay for this high-cost electricity. And this Court held that action by the PSC invalid under the Dormant Commerce Clause and did so because, as the Court put it, it was granting a preference to in-state residents at the expense of out-of-state residents who were going to have to pay higher electricity rates to fund the particular power plant at issue there. Now, I think that case... This isn't an analogous scenario, though. Well, I think what makes it analogous is just as in that case, what you have is the state saying, we're going to do what's best for Minnesotans, even if it hurts other people that are part of the interstate market in which we are granting a preference for Minnesota companies and for entities that are doing business in Minnesota. And again... Incumbency is a different condition than simply being a Minnesota company, isn't it? What incumbency requires is what the Supreme Court has consistently said is impermissible, which is drawing distinctions on the basis of the extent of your operations in the state. That is from the Supreme Court's decision in the Lewis v. Beattie investment manager's case. The court said, discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism that gives rise to the rule of virtual per se and validity. And that's the same principle that the court relied on later in the Carbone case, in the Granholm case. In Granholm, you had a New York law that said that if out-of-state vineyards set up shop in New York, then they could get licenses to distribute to local retailers, the retail customers. And New York tried to defend that by saying, look, we're not discriminating against out-of-state entities because they can all set up shop in New York if they want to. So we're just saying everybody needs to be here if they want to do this business. And the Supreme Court said, that's obvious overt discrimination against interstate commerce. I think you have the exact same thing here. You really don't need to ask this question of where anybody is headquartered because this law doesn't discriminate on the basis of headquarters. It discriminates simply on the basis of whether you presently have operations in Minnesota. It discriminates, as the court said, you cannot do on the extent of local operations in the state. So I think, and in that respect, the law is quite different from something like the Colon Health case that the other side has relied on in their briefs because that's a case where you had a facially neutral law. It was concededly facially neutral. And the question was whether it was being applied in a manner that resulted in discrimination on the basis of interstate commerce and out-of-state presence. And what the court said in that case, that was the Fourth Circuit case, they said, look, we can't always just use incumbency as a proxy for determining discriminatory effects because if all you've shown is that incumbents are part of a competitive process and they tend to do better in it, that might be because incumbents sometimes are better situated. And here, if Minnesota wanted to put in place a facially neutral regime that took into account a variety of factors and incumbents just did better because they can actually compete, that's fine. We're not here to say that incumbents couldn't possibly actually have some basis that shows that they are better suited to build a line. But what Minnesota's done is say, we're not interested in hearing if you're actually better suited to build this line. In fact, even if someone else can come in and show that they're better suited to build the line than you are. Well, how is what Minnesota's doing any different than what FERC expressly permitted before Rule 1000? Well, I don't think it is different, but the difference is FERC's not subject to the Dormant Commerce Clause. FERC is allowed to discriminate against interstate commerce just as Congress is allowed to discriminate against interstate commerce. So, you know, the federal government has more... Utility services within the wheelhouse of state's authority in its police power. This isn't utility service, this is interstate transmission of electricity. And the state here... Directly connected to local utilities. But in fact, no, the lines that we are talking about are not the lines that connect to the local utility service. They are the lines that are part of just the interstate grid. It's effectively like asking who can build a chunk of the interstate highway, not who can build, you know, the spur that goes off the interstate highway and constructs to the local town. What we're talking about is the interstate grid, and I take that to be why the state twice in its brief on pages 21 and 31 concedes that FERC has the power to preempt state rights of first refusal. Now, that shows that we're clearly not in an area where states have exclusive jurisdiction to do whatever they want. The state agrees that if FERC wants to, it can come in, and that just underscores why this is so different from Tracy, which was a case that dealt with retail regulation at the retail level, an area that is an area of exclusive state jurisdiction. And I think it's also worth noting that the particular concern that the Supreme Court had in Tracy was that there was the differential treatment at issue there had to deal with the actual retail service. And what was going on was, you know, you had an exemption that said that the local retailers who were providing gas, you know, their customers didn't have to pay the sales tax. And the question was whether the independent marketers that also were supplying gas should get the same exemption from the sales tax for their customers. And the court's concern was that if it treated those two entities the same in that retail market, it would allow the independent marketers to encroach on the local monopoly for retail service that the retailer has. Now, here, you know, this law has nothing to do, and I will use that phrase again, it actually does have nothing to do with the scope of the local monopoly for retail service. Nobody here has tried to argue that you need rights of first refusal in the market for constructing interstate transmission lines in order to prevent independent transmission companies from encroaching on the monopoly retail base of customers, you know, for a local retail monopoly. So, really, the principal animating concern of the Supreme Court in Tracy just isn't present here at all. We're in a completely different kind of market. There's no allegation that this kind of law has something to do with protecting the local monopoly. All the state is saying is that this law would be good for, you know, local utilities and really, frankly, everybody else who's covered by it since it's not a preference exclusively for local utilities. And the state's basically just saying, look, if we keep the money from the FERC rate in the state of Minnesota, that'll be good for Minnesotans. But that's the same argument that the Arkansas PSC was making in the Middle South Energy case. It's the same argument if you go back to the Supreme Court's cases, the Pennsylvania versus West Virginia, Oklahoma versus Wyoming, the New England Power Company case. These are all cases that we've cited and the United States has cited in its briefing. These are cases where states had laws that discriminated against interstate commerce in something other than the core retail services, but in the energy markets. They discriminated in the generation market or in the transmission market or whatever it may be. And in each of those cases, the state came in and said, look, we're doing this because it's good for our local retail utilities. It will help them keep down rates. And in each of those cases, the Supreme Court and this court said, that doesn't matter. That actually just shows that this is protectionism and that this is unconstitutional under the Dormant Commerce Clause. And you will not find a word in Tracy suggesting that it was intended to overrule that 100 years of jurisprudence in which the Supreme Court had repeatedly struck down regulations that were not in the retail market itself when they discriminated on the basis of out-of-state presence or discriminated against out-of-state entities or customers. If I can, I'll reserve the remainder of my time for rebuttal. Thank you. Thank you, Mr. Murphy. Mr. Murray for the government. Good morning, Your Honors. And may it please the court, Michael Murray for the United States. I'd like to make two points. First, the district court improperly extended Tracy in concluding that it creates a public utility exception to the Dormant Commerce Clause that forecloses LSP's claim. Counsel, are we even dealing with a utility here? This transmission company is defined as not a utility under Minnesota statute. Did you know that? I did, Your Honor. And that's exactly one of the reasons my first point as to why Tracy is. Proceed, I'm sorry. That's quite OK. Thank you for that. The second reason, I'll just jump right into the Tracy point, Your Honor. So that's the first reason Tracy is not totally applicable. We don't have a statute of state preference that applies to only a public utility. We have a transmission line company. The second reason. Not a public utility, right? That's right. The second reason is that in Tracy, we had a state preference that applied in both the captive and non-captive retail markets. We had the retail sales electricity that Your Honor was discussing with Ms. Murphy. And then we had also the large customers who were in a non-captive market. Here, we don't have a state preference that is applicable in both of those markets. We have a state preference that is only applicable in a non-captive market, the transmission line market. And so the question that was before the court in Tracy, that is, which of these two markets, the captive market or the non-captive market, should we give controlling significance to, is simply not presented here. Because there is no preference, no state preference in the captive market for retail sales of electricity to consumers. And so that question is just not presented. And so Tracy is distinguishable from this case. In addition, Tracy is also distinguishable even if that question were presented, if the question of controlling significance were presented. Tracy is distinguishable because the three factors that Tracy discussed apply differently in this context. So the first factor that Tracy was concerned about was whether there would be harm to the consumer market for the retail distribution of electricity because of a contracting customer base. The large customers would be taken outside, leaving the same fixed costs but fewer customers. That allegation is not in this case. And that's partly because the preference is not applicable to the distribution market. In addition, unlike in Tracy, where the court was very concerned about its institutional role, it was worried about fact-finding and predictions and that sort of thing. Here we have a situation where many states do not have state roofers. And in fact, Minnesota did not have a state roofer for some time. And so the record is a little bit different. And so the court can be a little less concerned about its institutional competence and can be more comfortable with applying the traditional dormant commerce clause. Of course, there was a federal right of first refusal during this period of time. So does that detract from your point? Yes and no, Your Honor. So I take your point. On the other hand, though, FERC determined in its order 1,000 that some of the concerns that the state has put forward with respect to how the grid will work, how the electricity markets will function, were not borne out in FERC's view. And so I think it cuts both ways. And FERC, as I should point out, and I think we're all on the same page, all the parties that is, FERC didn't approve this roofer in a meaningful sense for dormant commerce clause analysis. It, of course, only approved the MISO tariff that could implicitly incorporated by reference state law, which is a very different question than approving a state ballot. It's allowed. Say again? It's allowed. That's right, Your Honor. And I think that's the Seventh Circuit, Judge Posner's opinion, I think, makes that pretty clear. It's not an approval so much as it is an allowance. And so I wanted to come back to one other point that Your Honors had raised with my colleague, which is that Tracy is pretty clear that it's not creating this general public utility exception. And I would point Your Honors, just to give you a quote from the decision, it says, in Tracy on page 291, I believe it's footnote 12, the state regulation of the retail sales of electricity is not, as a constitutional matter, immune from our ordinary commerce clause jurisprudence. And I think that's indicative of- Is that in footnote 12? It might be footnote 8, Your Honor. I'm sorry. I didn't see it in footnote 12. It's on page 291. I might be misremembering. I've got the Westlaw stuff, so it's at the end. Sure, Your Honor. But you say it's in 8. 8, 8, yes, yes, Your Honor. I made a mistake on the number there. That's OK. And so I think that quote indicates that the state is going too far in indicating, or arguing, that Tracy creates a sort of general public utility exception. They say insulated. That's right, Your Honor. Utilities should not be insulated. That's right, Your Honor. But how thick the insulation is. Well, that is the question in this case. And what I think what that does is it belies the state's argument that Tracy creates this exception and that the normal commerce clause analysis doesn't apply. What the court should do is apply the normal commerce clause analysis and not just look at Tracy and then end its analysis right there. I see that my time has expired. Thank you. Do you have a position about whether this law discriminates against interstate commerce? So we have not taken a position on that in this court, Your Honor. We focused on what we saw as the errors in the district court's analysis. But the simple threshold question of discrimination, you take no position on? Well, the ultimate question. I may have misunderstood Your Honor's question. I think it's the first question in these cases. Does the law facially discriminate against interstate commerce? Right, Your Honor. So we haven't taken a position on that ultimate question in that case. Well, I think it's a threshold question because it does all the other avenues. Go ahead. OK. I see that my time has expired. Thank you. Thank you, Mr. Murray. Mr. Murasame. May it please the court, Jason Murasame for the Minnesota Public Utilities Commissioners and Commerce Commissioner. We ask this court to affirm the district court. Minnesota enacted the Roe for Law, which I mean the right of first refusal law, to preserve a system under which it is undisputed that electric transmission in Minnesota was reliable and the rates were low. Does the system that Minnesota set up with its law operate any differently than what was occurring under the permissive allowance prior to order 1,000? No, Your Honor. So this language about talking about incumbency, that comes straight from the federal Roe for. So if you look at what operated under before for a quarter number 1,000, look at MISO's tariff and the other ISO's, it is a Roe for incumbent transmission owners. So whether you're a vertically integrated utility or just a transmission company, if you're an incumbent, you have a Roe for. If you look at FERC order number 1,000, it talks about the federal Roe for incumbent transmission owners and then eliminating that. But that's what was in place. So Minnesota was replicating what was in place for the incumbency. They're trying to make it seem like the language using the incumbent is a way of smuggling in in-state discrimination. It's a way of replicating what had undisputably worked for reliable transmission. But imposed by federal authority, not by state authority. Correct, Your Honor. Back to your state authority. I do read the statute right that a transmission company is not a public utility. That's correct, Your Honor. It's not defined. That's correct. Doesn't that make much of Tracy irrelevant here? Because every other line of Tracy, I'm exaggerating, sorry. Every other line of Tracy talks public utility, public utility, public utility. So does that pretty much say Tracy doesn't apply here? No, Your Honor. What about the standard ordinary commerce clause talk? I think there's still a couple of key points that bring Tracy into it. First is, these transmission companies are regulated by FERC's oversight. They're members of MISO. ITC's a member of MISO. These transmission companies are members of MISO. FERC sets that all up, oversees that whole regional process. So they're not utilities, but they are part of the regime that FERC is regulating. And FERC is deciding where to draw the lines. The transmission companies had a right of first refusal under FERC's oversight and approval previously. And FERC has decided to allow that to continue. The second piece is, you've got to look at the similarly situated language in Tracy that is through and through a key part of the Tracy opinion. And it applies here. When we're talking about reliable electric transmission, we're talking about incumbency here. We're not talking about, oh, you have a franchise for restaurants in the state. You get to build a restaurant over there. This is the incumbent substation. It is their control equipment. It is their computer system. We need to hook the lines up there to get the electricity through. They are uniquely suited to do that. Yeah, but how do you distinguish LSP from ITC Midwest? You can't distinguish them, can you? No. Except that ITC does business in Minnesota. Correct, Your Honor. And LSP doesn't. That's correct. Doesn't that mean that this, on its face, violates interstate commerce clause? No, Your Honor, because Minnesota has no preference for how the transmission company enters the market. When the federal ROFA was in place, ITC was not an incumbent at first. ITC acquired transmission lines in Minnesota. So Minnesota statutes 216B.16 subdivision 7C allows for the transfer of transmission assets subject to commission, public utilities commission approval if it's in the public interest. Any transmission company, no matter where you're from, has the same right under the law to acquire transmission assets in Minnesota and become an incumbent. That's what ITC did. Except for there's a right of first refusal. So you can't buy one where there's a right of first refusal in place, right? That's the whole point of this case. I mean, they have the same ability to enter the market by acquiring existing transmission facilities. Any transmission company could come and say, we're going to purchase this. Sell us that. Exactly right, Your Honor. Sell us that. That's true for everyone. So there's a premium at stake here. And the one that's not in the market has to pay a premium to get in. Presumably. Under the right of first refusal. At the end of the day, we're talking about who makes money from building this transmission. And Minnesota doesn't care where you're from, how you make the money. What we care about is reliable transmission. Whether you're an economic interest in this state, right? But the reason is because, for the first time, FERC is opening up this piece of the utility, of the energy market, to competition. For the first time. And FERC, in order number 1,000, recognizes that there are going to be new companies that are going to want to come in and make money in this space. And not all of them are going to have the expertise and resources to build transmission reliably. So in FERC order number 1,000, FERC says, OK, the ISOs, MISOs. But to that point, don't you still have to go before your public utilities commission, even if they come in and they were allowed to compete? There's no right of first refusal. Can't the public utilities officials say, you can't begin to do this LSP, right? To come in and get, you need commission approval to acquire the transmission. Right of first refusal. Yes. They could come in, make a proposal, and the PSC of your state, whatever it's called, let's call it my state, could essentially not even let them in the door, right? Yeah, I mean, there's public interest factors. I've got it, but you've got it for good reasons, of course. Yes, right, exactly. Proceed. So the point is then, so FERC opens this up, and they say, MISO, our regional transmission organizations, develop standards and criteria that are going to screen out these companies that don't have the expertise and resources to do this reliably. And then, so Minnesota has a choice. They can preserve a system that unquestionably is working, or it can move to a system where it's competition for the first time, new standards and criteria to screen out those who can't do a good job, that there's uncertainty and risk. Your commission's up to that. This is a regulatory state. But we have no control over that. So you're saying, hey, my my. No control. All they get to do is compete. All they get to do is bid, right? We have no control over the standards or processes that these regional transmission organizations are implementing. You can keep them from actually doing anything in your state, right? Yeah, I mean, so once you get the approval, you still need a certificate of need from the Public Utilities Commission. Yes, which is the general approval. Correct. That's right, Your Honor. So we could. But the stepping back, the point is that Minnesota has a system that is working well. And then you say, oh, competition always works well when you deregulate the utilities industry. Trust us. Minnesota says, let's go slow. Let's preserve the system that's working. There are, I believe, six states now that have ROFRs in place. What six states are they? North Dakota, South Dakota, and Nebraska, Oklahoma, Minnesota, and Texas recently passed one, to my knowledge. Thank you. That's it. And for the rest, you have this competitive process ordered by FERC. If, as they contend, competition is only a good thing, you're going to get all the reliability at lower rates. And don't worry about the reliability. It's all going to work out. We have a natural experiment going on right now under FERC's oversight. FERC draws the lines here. And I'll just add, I'm running out of time, but I just want to add, this is a key distinction with Tracy. This case deserves more deference from Tracy because of FERC's involvement. One of the key reasons for deference in Tracy is if there's other branches of the federal government other than the judiciary who can step in and fix this. There is no question FERC can step in and fix this. FERC is regulating in this space. LSP asked them to say, hey, find this roe for practice. Unjust and unreasonable. End it. You have the authority to do it. FERC said, no, we don't want to. They tried to twist that to their advantage that under Tracy, that is a key reason for deference to the policy choice Minnesota has made in this case. Thank you very much. Thank you, Mr. Morrison. Mr. Van Oort. Good morning, your honors. May it please the court. I'm Aaron Van Oort representing Xcel Energy and ITC Midwest. There's a key distinction here that I want to be very clear on. Reducing competition is not the same as discriminating against interstate competitors. Whether to have competition at all and how much of it to have is a policy choice. Unless it violates the Interstate Commerce Clause. If it discriminates. If you allow competition, you can't discriminate. But deciding whether to have competition at all is not a matter for the Commerce Clause, its policy. And I just want to quote from the Chief Justice in the United Haulers decision from here. Here's what he said in this case. The policy of the state of New York favors displacing competition with regulation or monopoly public control in this area. We may or may not agree with that approach, but nothing in the Commerce Clause vests responsibility for that policy judgment with the federal judiciary. Minnesota has chosen not to have competition. That is a valid choice, and it's one that's been deferred to in the area of electricity regulation for 100 years. At all three stages? Your Honor, they haven't distinguished between whether there's regulation in generation, regulation in transmission, regulation in distribution. I know LSP distinguishes between that. It happened to be that utilities were the only thing at issue in Tracy. Of course, Xcel Energy is a utility, and they're here. But the logic of Tracy was about regulation versus not regulation. And it said, this is an area of overwhelming state interest. And that's undisputed here, and this court is recognized in the Southern Union. This is one of the areas of greatest state interest because of the obvious effects on health. And the states can go about it a number of different ways. They can open up a competitive market, and then they better not discriminate. Or they can choose to have exclusive providers. That's what this does. It is a mischaracterization of this statute to say that what's happening here is Minnesota is saying only in-state entities can compete. Nobody's competing. Minnesota has said, if the line is built in the area you're in, you get to build it. It's really a Minnesota nice way of saying it because they say, first, we'll give you a right of first refusal. But then if you don't take it, we can order you to do it. It's just a way of saying, we've decided historically all throughout here that we're going to have, in the certain areas, those people do it. And to make sure that we have this work, we're going to regulate them. We're going to regulate the rates. There is no doubt, of course, that this choice has an indirect effect on commerce. And we can speculate about whether it's going to raise the rates or decrease them. LSP is actually mischaracterizing the rationale for this when it's saying that this is just designed to make returns flow back here. If you go to the background, the legislative history, what they're saying, and this is in the appendix at page 34 to 50, what they're actually saying is that the FERC tariffs for transmission are higher than the rate of return that Minnesota allows for its utilities. And so if it's actually a Minnesota company that does it under there, it's going to actually require them to put back some of that tariff to the consumers. So there is actually economic testimony saying that this would result in lower rates for Minnesotans. The real thing that the legislatures were doing, though, is they were saying, we want to maintain control over this, local control over this, because FERC had eliminated the federal right of refusal, but they didn't have a new federal policy for how they'd even pick. There wasn't a possibility. And if you read the history, the legislatures and the Public Utilities Commission said, look, we aren't just going to leave this up in the air to an unknown process. We're going to keep doing it the way we've always done it. Because it works. And as this court recognized in the Northwest Arkansas government haulers, an interest in maintaining local decision making is legitimate. That's a legitimate basis for doing it. It's not discriminatory. Any argument that this is discriminatory on its face fails, because the statute says the right of first refusal is given to any existing provider that you're going to hook up to. Whether it's Minnesota, South Dakota, or IT Midwest, Michigan, it doesn't matter. And conversely, the burden is placed on everybody, no matter where you're from. The argument that they're making is an argument about discrimination in effect. They're saying this act has the effect of precluding more out-of-staters from coming in. What do you do about the language in the, like the organs case, organ waste systems case, it says differential treatment of in-state versus out-of-state economic interests. And they use that term. That does sound like it's contrary to what you just said. Yeah, it's a broad phrase, your honor. And this is one of the dangers in Commerce Clause. There are so many different variations. If you pluck words from a different situation and try to apply them, all of us can quote stuff go in any direction. So you've got to look at context. So here's what I think they mean. One classic set of cases is where a state requires something to happen in that state that wouldn't have to happen there. That's like the cantaloupe processing or the Dean milk case, where you say it's got to be processed by Madison to sell to Madison. And so you're forcing something to happen in the state that wouldn't do it. That's not happening here, because everybody concedes this line has to be built between Mankato and Wilmarth to get power there. This is going to happen. That's not what we're doing. Another form of discrimination is saying we're not going to let products from out of state come in unless they build a facility here. That's not happening, because generation can come from anywhere. Or they differentially tax it coming in. That's not happening here, because FERC controls the rates. Or they say the garbage cases, we don't want your garbage. Keep it out. That's not happening here. Or they say the classic discrimination is saying if you want to do it here, you have to incorporate here. You have to headquarter here. That's not happening. None of the things that have protectionism, that are classically associated, are happening here. This is all about a line that everybody agrees is going to be built in Minnesota and has to be built here, and the federal planning process says built here. The only question is who's going to build it and operate it? And Minnesota said, we have a process. We're not going to do a competitive process for that. And Ms. Murphy described this accurately when she said that the statute precludes competition. That's the choice they made. It precludes it. It doesn't discriminate. Well, no, it doesn't preclude all competition, because somebody can buy somebody else. It's a premium for an out-of-state interest to buy in. No, there's not a premium, Your Honor. Yeah, because the right of first refusal gives a benefit to the local person that can connect now. Yeah, Your Honor, I think we're talking about two different things. One is. It pre-ended the state. One thing is, who can enter this market at all? Not to build a particular line, but who can enter? And it's undisputed that the definitions here don't limit the transmission companies or utilities to Minnesota companies. We pointed out the definitions they allow anybody in. And out-of-state competitors can enter the market by buying existing facilities. That's where the premium comes in. Well, I don't know if you'd have to pay a premium there. Yeah, you do, because the right of first refusal gives a benefit to who's already there. And a conglomerate would tell you there has to be a premium there. Well, Your Honor, predicting exactly who's going to pay how much for what facilities and all that, I think, is beyond the scope here. They would be valued based on whatever opportunities they have. And if you want to buy into the market, you can. I agree with you there. But the real question here comes back to, and I think you said this is a gating question. Under the Commerce Clause, you either apply strict scrutiny, under which it basically fails. Or you do a deferential balancing test, PIKE. And the real question here is, which of these regimes do we fall under? I'm going to wait until the music stops on that. But the real question is, which one do we fall under? And we've pointed to the cases saying, this doesn't exhibit any of the tendencies of the cases that have fallen under the strict scrutiny. It'd be really unusual in extension to have a public utility regulation like this have the court say, it just per se fails. What you would typically do is you'd look at the strength of the interest on this, and you would go through it. And you'd say, well, this is a really strong interest because it directly affects the health and safety of Minnesotans. So you think this needs a remand for the PIKE balancing test? No, not at all. In the area of utility regulations, if you get to PIKE, generally it's affirmed because of its- Yeah, but this is on a motion to dismiss, right? No, absolutely, Your Honor. Yeah, well, at least you ought to hear it from somebody. Oh, no, Your Honor, we can do this based on the allegations. I mean, they've made allegations about what the burdens are. And the strength of the public interest is established as a matter of law under the Southern Union case here. They said, historically, this is strong. There's no dispute. So are we doing the PIKE balancing test? What's that? So then are we doing the PIKE balancing test if the law does not discriminate on its face? Yeah, this is up to Your Honors. OK. We cited the ALCO case is the case out of the Second Circuit. It's the most recent one that applied Tracy. It had to deal with the energy credits. And Connecticut had a statute that said you're only going to count renewable energy credits if they come from this area. And so you can't count Georgia ones. That was on a motion to dismiss. And the court applying the PIKE balancing test, it wasn't discriminatory under the Tracy rationale. And under Palancing, they dismissed it on the pleadings. This court, there's a Grand River Enterprises case that we cited. There's a Commerce Clause challenge coming out of tobacco settlement. You resolve that on a motion to dismiss on PIKE balancing. And we've referred to the other ones, too. So if you get to deferential world and you conclude that this really is a neutral regulation on this, the strength of the state interest is just overwhelming at that point. And so you don't need any facts. I want to go back and finish here on just discriminatory effect. There's been this argument here that there's a discriminatory effect. All of the cases that counsel mentioned at the podium and all of the cases that they cited in their briefs, not a single one of them found a discriminatory effect just based on the fact that a neutrally applicable law that applies to everybody, there might be more people that it applies to out of the stage simply by sheer numbers. And we cited the cases, the CTS court case in the Supreme Court dealing with their corporate takeover statute. We cited the Commonwealth Edison, which dealt with a tax on coal, where 90% of it was going to be born out of state. And they say, no, that doesn't count. If it's a neutrally applicable law and it just happens that they're more out of state, that's not what we mean. Every case they cite was either facially discriminatory or discriminatory in purpose. And that's what was really driving the court. And so the SDDS case, this is the garbage dump case in South Dakota, where they had a referendum saying, keep the garbage out. The court talked about discriminatory effect, but it was matched with purpose. And there's just nothing like this here. In their CAPS Newfoundland case, it was a facially discriminatory property tax. It says, we're going to give an exemption only to charities in the state whose customers are in the state. There's nothing like this here. It applies to everybody. This is like the IESI case on there, as in Arkansas waste haulers, where there's a restriction on everything and it applies neutrally. It would be a really big extension of Dormant Commerce Clause to strike down a neutral utility regulation like this electric regulation. It would extend it there and would put this court in the market making policy. That's not where it should be. LSP is right. The market is moving. If the court stays out, the market can continue to move. But if the court constitutionalizes it, it stays here and the market's frozen. That's not what we should do. Thank you, Mr. Van Oort. Ms. Murphy, your rebuttal. Thank you. Just a few points. First, this law is facially discriminatory. On its face, it says, you only are an incumbent if you have facilities in Minnesota. The Supreme Court has said that laws that discriminate on the basis of the extent of local operations are facially discriminatory under the Dormant Commerce Clause. That's the principle that this court applied in saying that the ordinance in Ben Orleans was facially discriminatory. It didn't say on its face, this and not out of state. It said, all the business is going to go to x and x happens to be in state. That's facial discrimination, and that is subject to the rule of virtual per se in validity. Now, the counsel on the other side here says, oh, the Supreme Court has said that deciding to not have a competition is a choice. United Haulers was a case that said, if a state decides to own the garbage processing facility itself, then it can choose not to have competition. But if the state is giving preferences to private investor-owned utilities or companies or whatever it may be, not to state-owned facilities like in United Haulers, but it's denying competition in the private market, that's not a choice the state gets to make. That's what the whole line of cases of CNA Carbone and Ben Orleans and all of these flow control cases and all of these other cases are about. If the state says, we're going to effectively create private local monopolies, unless the state is operating in the unique context of retail distribution, it doesn't get to say, we're going to keep everybody else out. And it doesn't get to say, we're going to keep everybody else out, but it's OK, just because we've allowed, we've kept out some Minnesotans as well. Ben Orleans likewise rejects that argument and says, the fact that you've discriminated both against out-of-state entities and against some in-state entities doesn't make it any better, because you're still facially discriminating against interstate commerce. Now, the state says, and interveners here say, you know, this is all about, we have to worry about reliability and we have to worry about who's going to be able to do this. First, FERC itself directly responded to all of that by saying, look, we're going to have a process where, in order for anybody to compete, first at the MISO level before we even get to the state process, you have to demonstrate that you're qualified, both financially and technically. There's a whole list of things you have to show that demonstrate we can construct and operate one of these facilities. We can maintain it. We can do all of the things that need to be done. So we have to do that to get in the door. We then have to actually win the competition at MISO. And if an incumbent comes in and has a better proposal, they'll beat us out, because they should, not just because they say, hey, we're incumbent, so nobody else gets to compete. Now, that's all just the MISO process. And even if we get through that and get selected by the federally regulated operator, we still have to go through the state process. The state has a certificate of need process and a route permitting process where it gets to ultimately decide whether we're qualified to construct this line. And as the Supreme Court recently said in the Tennessee Wine and Spirit case, that's how states exercise their regulatory authority. If they're concerned that someone they haven't dealt with before might not be good at what they're about to do, you regulate them. You make them subject to qualifications and subject to requirements. You don't say, we're just going to leave everybody outside of Tennessee out of our commerce. You don't say, everyone who's not already an incumbent, the door is just closed to you from the start. And the final thing I would say is, there's nothing unusual about the notion of striking down laws in the area of energy as being facially discriminatory against interstate commerce. Pennsylvania versus West Virginia, a case goes back to 1923. New England Power, that's a 1982 Supreme Court. Wyoming versus Oklahoma, that's a 1992 Supreme Court. This court's decision in Middle South Energy, these are all cases that held that discrimination in the context of the energy markets, state laws that granted preferences that were designed to save money for local rate payers were unconstitutional under the Dormant Commerce Clause and were subject to the rule of virtual per se invalidity. Because that is the ordinary rule that applies in this context, just like all others. It is only in the very narrow context of retail providers that have a local monopoly on retail service that states have special leeway to protect those monopolies from competition. Thank you. Thank you, Ms. Murphy. Thank you also to other counsel who have argued before the court this morning. Thank you for providing that argument to us. In the briefing that you've submitted, we will take the case under advisement and render a decision as promptly as possible. Thank you. You may be excused. Madam Clerk, would you call case number two for argument this morning? Yes, Judge. Second case is consolidated, 18-3018, 18-3061, Balvin v. Rain and Hill.